# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROSALIE L. TURNER,             :
                                :
           Plaintiff,            :       Civil Action No.:     02-1514 (RMU)
                                :
           v.                     :       Document No.:      29
                                :
DISTRICT OF COLUMBIA,      :
                                :
           Defendant.       :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The plaintiff, Rosalie Turner, is a doctor and former employee of the Southeast Sexually Transmitted Disease Clinic ("S.E. Clinic") at D.C. General Hospital. Defendant District of Columbia provides services through the D.C. Department of Health and D.C. General Hospital. The plaintiff sues the defendant under 42 U.S.C. § 1983, the Equal Pay Act, the Americans with Disabilities Act, the Rehabilitation Act, and for intentional infliction of emotional distress. The plaintiff alleges that she suffered adverse employment actions and a hostile work environment as a result of a custom or policy of the District of Columbia (the "district") to discriminate against women during her three-decade long career as a physician employed by the District of Columbia Department of Health ("DOH"). Also, the plaintiff claims that she was discriminated against because of her medical illnesses. Furthermore, she claims that she was retaliated against for filing a complaint with the District Office of Human Rights. Finally, the plaintiff seeks damages for intentional infliction of emotional distress under District of Columbia law. This matter

comes before the court on the defendant's motion to dismiss or in the alternative for summary judgment.

Because plaintiff's involuntary discharge, failure to inform of salary enhancement, and pre-February 22, 2000 ADA and RA claims are time-barred, because plaintiff fails to establish a prima facie case of sex discrimination for understaffing, constructive discharge, and forced job description re-writing, because plaintiff fails to establish a prima facie case under the Equal Pay Act, and because plaintiff fails to establish a prima facie case of hostile work environment and intentional infliction of emotional distress, defendant's motion for summary judgment, as to those claims, is granted. Because a genuine issue of material fact exists whether the S.E. Clinic supervisors denied plaintiff use of sick days in retaliation for a complaint she filed, defendant's motion for summary judgment as to that claim is denied.

## II. BACKGROUND

### A. Factual Background

The plaintiff alleges as follows. The plaintiff, a physician, was employed at the S.E. Clinic in the district from August, 1972 to September, 2004. Am. Compl. ¶ 18. The Clinic is operated by the DOH. *Id*. ¶ 6. The plaintiff, originally hired as Chief Medical Officer of the S.E. Clinic ("Clinic Chief") in 1972, was promoted to Bureau Chief of STD Control for the district ("Bureau Chief") in 1976. *Id*. ¶¶ 19-20. The plaintiff was the first woman to hold the Bureau Chief position. *Id*. ¶ 21. Although the Bureau Chief position had previously been a full-time position, *id*. ¶ 22, the plaintiff was required by DOH officials to perform the duties of both Bureau Chief and Clinic Chief, *id*. ¶ 24. Despite numerous requests for administrative support and additional personnel as the S.E. Clinic began to undergo a staffing shortage, DOH officials

"failed or refused to attend to such needs or to replace such staff as positions became vacant." *Id*. ¶ 29.  The plaintiff states that the district had sufficient funds to hire the staff members the plaintiff requested.  *Id*. ¶ 30.  The plaintiff requested and received permission in October of 1977 to return solely to the position of Clinic Chief, *id*. ¶ 33, an action she claims she was forced to take as a result of the "intolerable working conditions" of being required to perform the duties of both positions simultaneously and understaffing at the S.E. Clinic, *id*. ¶¶ 31, 35.

Similar conditions at the clinic, according to the plaintiff, persisted and worsened.  *Id*. ¶ 37.  In 1989, several employees left the S.E. Clinic, causing another staffing shortage.  *Id*. ¶ 38.  Because the conditions worsened, the plaintiff was forced to assume additional duties outside of her position, including "duties normally performed by non-professional, supervisory, and administrative staff, including but not limited to: (1) performing time-keeping duties, and (2) ordering, checking and maintaining medicine, general office supplies, and clerical and medical equipment stock."  *Id.* ¶ 39.

Additional preventative health technicians at the S.E. Clinic departed in the early 1990s. *Id*. ¶¶ 42-43.  The Northwest Clinic ("N.W. Clinic") was evicted or lost its lease,  Opp'n Ex. A ¶ 3 (Turner Aff.), which resulted in the merging of the N.W. and S.E. Clinics in 1995, Am. Compl. ¶ 44.  As a result of this merger, six N.W. Clinic employees – five physicians, a nursing assistant, and a preventative health technician, were transferred to the S.E. Clinic.  *Id*. ¶ 45. Within one month of this transfer, however, all but two of those physicians had left the S.E. Clinic, *id*. ¶ 49, due to the "extreme differences in working conditions" between the two clinics, including a "greater patient-to-doctor ratio on a daily basis, more extreme cases, and a marked surge in cases of genital ulcer disease and syphilis among patients attending the [S.E. Clinic]," *id*. ¶ 47.  Additionally, although nursing assistant Mrs. Britt had performed some of the duties at

the N.W. Clinic that the plaintiff was performing at the S.E. Clinic, such as ordering medicine and supplies, Britt was directed not to perform such duties at the S.E. Clinic following the merger. *Id*. ¶ 49.

The plaintiff alleges that the DOH failed to inform her of a salary enhancement program until 1983, although she was eligible for the program beginning in 1979. *Id*. ¶ 56. The results of understaffing also prevented the plaintiff from participating in a management enhancement training course. *Id*. ¶ 55. In March 1999, the plaintiff became "seriously ill" with hypertension and diabetes, illnesses the plaintiff alleges are "directly attributable to the long-standing and unreasonable physical demands, stress, and duress of the working conditions[.]" *Id*. ¶ 62.

In May of 1999, the plaintiff informed the Administrator of Preventative Health Services, Dr. Calderone, of her condition and her need for "accommodation." *Id*. ¶ 65. Dr. Calderone directed the acting Bureau Chief, Pete Moore, to "immediately find money" to hire an additional physician for the S.E. Clinic, and promised to hire a second physician in October. *Id*. ¶ 66. No additional physicians were hired, however, and the plaintiff submitted a request to "retreat" from her position as Clinic Chief to a less demanding position – the position of medical officer – on August 23, 1999. Pl.'s Original Opp'n at 33[1]; Am. Compl. ¶ 71.[2] DOH officials "agreed to accommodate plaintiff's illness by permitting her to move into the existing medical officer position," Am. Compl. ¶ 184, and the plaintiff's resignation as Clinic Chief became effective on November 7, 1999. Pl.'s Original Opp'n at 34.

---

[1] In their current motions before the court regarding the plaintiff's amended complaint, both parties refer to and incorporate their previous motions regarding the plaintiff's original complaint, including the defendant's original motion to dismiss, or for summary judgment ("Def.'s Original Mot."), the plaintiff's original to that motion ("Pl.'s Original Opp'n"), and the exhibits included therein. The court will consider these materials and exhibits accordingly.

[2] In her most dramatic description, the plaintiff accuses the defendant of intending "to make her working conditions so intolerable that she would have no place to retreat to but home, another job (even though she was close to retirement), a hospital or the morgue." Pl. Opp'n at 21.

On October 4, 1999, Pete Moore called the plaintiff and demanded that the "existing and long-standing" job description for the position of medical officer be changed to add more responsibilities and duties before the plaintiff would be allowed to assume it and receive the same pay as her male predecessor, Dr. Elliot. *Id.* ¶¶ 74, 77; Pl.'s Opp'n Ex. A ¶ 10.  The medical officer job description was rewritten using "broad language" in order to force the plaintiff "to perform any and every duty in the clinic at the whim of her supervisors[.]" *Id.*

In March 2000, Dr. Shukdeo Sankar, a male, was hired as the new Clinic Chief.  Am. Compl. ¶ 82.  The plaintiff alleges that Dr. Sankar has since received the additional staff and support that the plaintiff repeatedly requested to no avail while Clinic Chief.  *Id.* ¶ 85.  DOH officials have not required that Dr. Sankar perform all of the duties in his job description as Clinic Chief, as they required of the plaintiff.  *Id.* ¶ 88.  Rather, Dr. Sankar has required the plaintiff to perform some duties included in his job description, and not included in her job description as a medical officer.  *Id.* ¶ 90.  The plaintiff also alleges that Dr. Sankar has denied her the legitimate use of sick days, *id.* ¶ 192, and ridiculed her for taking some sick days, *id.*, after he learned she had filed a complaint with the D.C. Office of Human Rights ("OHR"), *see* Pl.'s Opp'n, Ex. B.

The plaintiff alleges that these actions constitute a district "policy or custom," set intentionally or as a result of deliberate indifference of discriminatory treatment of women, and discriminatory treatment against her because of her illnesses.  Am. Compl. ¶¶ 96-97.

### B. Procedural History

 The plaintiff filed her complaint on July 31, 2002.  In June 2003, the court denied the defendant's motion to stay the proceedings.  *Turner v. District of Columbia*, 268 F. Supp. 2d 23 (D.D.C. 2003).  The district filed a motion to dismiss, or in the alternative, for summary

judgment, on September 4, 2003, which the plaintiff filed an opposition to on October 21, 2003.

The defendant filed a reply ten days later.  In July, 2004, the court ordered the parties to submit

further briefing on why the plaintiff's claim against the district under § 1983 should not be

dismissed where that claim failed to allege that "execution of . . . official policy or custom is

responsible for the deprivation of constitutional rights."  July 28, 2004 Order (citing *Morgan v.*

*District of Columbia*, 824 F.2d 1049, 1058 (D.C. Cir. 1987)).   Following the submission of

further briefing by both parties, the court granted the plaintiff leave to amend her complaint to

correct her allegations, and the plaintiff filed her amended complaint on November 1, 2004.  The

defendant filed its motion to dismiss or in the alternative for summary judgment currently before

the court on January 7, 2005.  The court now turns to that motion.


## III. ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment[3]

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[3] The plaintiff asserts that because her complaint is a "verified" complaint, it may serve as her statement of disputed material facts.  To support this surprising and unfounded conclusion, the plaintiff cites numerous cases for the proposition that "[a] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge."  Pl.'s Opp'n at 26 (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).  The plaintiff may rely on allegations in her complaint as the *source* of facts asserted in her statement, but this allowance in no way alters the procedure and manner in which such facts must be asserted.   Local Civil Rule 56.1 requires that an opposition to a motion for summary judgment accompanied by a statement of undisputed material facts "shall be accompanied by *a separate concise statement of genuine issues* setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  LCvR 56.1 (emphasis added).  "In determining the undisputed facts that exist in a case for the purposes of reviewing a motion for summary judgment this Court *strictly adheres* to the text of Local Civil Rule 56.1."  *Gibson v. Office of the Architect of the Capitol*, 2002 WL 32713321 at *1, n.1 (D.D.C. November 19, 2002) (emphasis in original).  The court will assume "that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

## B.  Legal Standard for 42 U.S.C. § 1983 Claims

To determine municipal liability under 42 U.S.C. § 1983, the district court must conduct a two-step inquiry. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  First, the court determines whether the plaintiff establishes a predicate constitutional violation. *Id.*  If so, the court then determines whether the complaint states a claim that a custom or policy of the municipality caused the violation. *Id.*; *Monell v. Department of Social Services of N.Y.*, 436 U.S. 658, 694 (1978).  The second prong requires a determination of whether "a policy or custom of the District of Columbia caused the constitutional violation alleged under the first prong." *Baker*, 326 F.3d at 1306; *Monell*, 436 U.S. at 694.  As the court in *Baker* stated, the plaintiff must

> allege[] an "affirmative link," such that a municipal policy was the "moving force" behind the constitutional violation.  There are a number of ways in which a "policy" can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution; the action of a policy maker within the government; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom"; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Baker*, 236 F.3d at 1306-07 (internal citations omitted).

### C.  Legal Standard for Discrimination under 42 U.S.C. § 1983

Generally, to prevail on a claim of sex discrimination under § 1983, a plaintiff must follow a three-part burden-shifting analysis generally known as the McDonnell Douglas framework. *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995) (holding that claims of sex discrimination brought under § 1983 and Title VII are subject to "[i]dentical methods of proof," including the *McDonnell Douglas* framework, and citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, n. 1 (1993).  The Supreme Court explained the framework as follows:

> [f]irst, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" . . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (quoting *McDonnell Douglas*, 411 U.S. at 802).

To establish a prima facie case of discrimination, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).  "The burden of establishing a prima facie case of disparate treatment is not onerous."  *Burdine*, 450 U.S. at 253. If the plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee.  *Id*. at 254.  To rebut this presumption, the employer must articulate a legitimate, non-discriminatory reason for its action.  *Id*.  The

employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id*. Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappears, and the sole remaining issue is discrimination *vel non*." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (internal citations omitted).  At this point, to survive summary judgment, the plaintiff "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Id*. (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)).  The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff.  *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka*, 156 F.3d at 1289).  The plaintiff need not present evidence in each of these categories to avoid summary judgment.  *Aka*, 156 F.3d at 1289.  Rather, the court must assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case.  *Id*. at 1291.

### 1. The Court Grants Defendant's Motion for Summary Judgement

The plaintiff makes five discrete claims: (1) involuntary discharge, (2) failure to inform plaintiff of salary enhancement, (3) persistent understaffing, (4) constructive discharge, and (5) change in job description.

It is unclear whether the plaintiff seeks relief for these five claims as specific alleged adverse acts or includes them as a part of a hostile work environment claim. The plaintiff's reply seems to suggest the latter, *see* Pl.'s Reply at 11, but the court will analyze her claims under both theories: first, whether the plaintiff has a viable claim based on any of the discrete adverse employment acts complained of, and second, whether she has a viable hostile work environment claim.

### a.  The Plaintiff's Theory of Discrete Adverse Employment Acts

### a.  The Involuntary Discharge and Failure to Inform of Salary Enhancement Claims are Time Barred

Where state law provides multiple statutes of limitations for different kinds of personal injury actions, federal courts adjudicating § 1983 claims borrow the general or residual statute for personal injury actions.  *Owens v. U.U. Okure*, 488 U.S. 235, 249-50 (1989).  There is a three-year residual statute of limitations in the District for personal injury claims.  D.C. Code § 12-301(8).  In *Nat'l R.R. Passenger Corp. v. Morgan*, a Title VII case, the Supreme Court held that discrete acts of discrimination that are inside the limitations period cannot "save" other discrete acts *outside* the limitations period from being time-barred, even when they are closely related to one another.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (rejecting the "continuing violation" doctrine as to discrete acts, and stating that "[e]ach discriminatory act starts a new clock for filing charges alleging that act").  The same analysis should be applied to discrimination claims brought under § 1983.  *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393-95 (1982) (holding that the Title VII administrative charge period is functionally equivalent to a statute of limitations); *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003) (applying *Morgan* to the timeliness

of discrete acts brought under § 1983); *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003)

(finding "no principled basis upon which to restrict *Morgan* to Title VII claims").

The plaintiff, after a vague and meandering discussion of the Court's holding in *Morgan*,

relies on two cases for the proposition that "when a continuing violation can be shown, the

plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even

conduct that occurred outside the limitations period." Pl.'s Opp'n at 16 (quoting *Cromwell v.*

*Robinson*, 23 F.3d 695, 703 (2d Cir. 1994), and relying on *Hull v. Cuyahoga Valley Board of*

*Education*, 926 F.2d 505, 511 (6th Cir. 1991)). The plaintiff's reliance is misguided, for that

proposition was flatly rejected by the Supreme Court in *Morgan* regarding discrete instances of

discrimination. *Morgan*, 536 U.S. at 113 (reversing the circuit court's holding that "so long as

one act falls within the charge filing period, discriminatory and retaliatory acts that are plausibly

or sufficiently related to that act may also be considered for the purposes of liability")(citations

omitted). The plaintiff correctly recognizes that the reasoning illustrated in *Cromwell* is "much

like" the decision in Morgan "regarding a hostile workplace claim," Pl.'s Opp'n at 16, but the

plaintiff erroneously implies that the same is true for discrete adverse employment actions. It is

not. It is not the case, as plaintiff argues, that any plaintiff bringing a § 1983 claim who employs

the words "pattern or practice" in her complaint may avoid the statute of limitations. "Pattern or

practice" refers both to the use of collateral evidence of systematic discrimination for an

individual claim, *Williams v. Boorstin*, 663 F.2d 109, 115 n.38 (D.C. Cir. 1980), and an approach

available in class action lawsuits alleging discrimination against a class, *Palmer v. Shultz*, 815

F.2d 84, 90 (D.C. Cir. 1987). While an individual plaintiff may use evidence of time-barred acts

"to establish motive and to put his timely filed claims in context," *Carpinteria*, 334 F.3d at 800-

801, such evidence "can only be collateral to evidence of specific discrimination against the

actual plaintiff," *Williams*, 663 F.2d at 115 n.38.  Thus, while evidence of a pattern or practice is relevant to an individual's claim for discrimination, an individual may not rely solely on a "pattern or practice" theory to prove his claims.  *Murphy v. PriceWaterhouseCoopers, LLP*, 357 F. Supp. 2d 230, 246 (D.D.C. 2004).  Accordingly, the reasoning in *Morgan* is applicable to the plaintiff's individual claims.

The plaintiff filed her complaint on July 31, 2002, and accordingly, any alleged discrete adverse employment actions that occurred prior to July 31, 1999 are barred by D.C.'s statute of limitations.  The D.C. Circuit has described an adverse employment action as "an action with materially adverse consequences affecting the terms, conditions, or privileges of employment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002).  Therefore, claims based on the plaintiff's "involuntary discharge" from the position of Bureau Chief, am. compl. ¶ 35, and the defendant's failure to inform the plaintiff of a salary enhancement program, *id*. ¶ 56, are time-barred if brought under a discrete acts theory of discrimination.

**b.  The Plaintiff Fails to Establish a Prima Facie Case for Her Long-Standing Understaffing, Constructive Discharge, and Change in Job Description Claims**

As explained more fully below, three of the plaintiff's alleged adverse employment actions are not time-barred: (1) long-standing understaffing of the S.E. Clinic; (2) the plaintiff's "constructive discharge" from the position of Clinic Chief, forcing her to "retreat" to the position of Medical Officer; and (3) the "forced" re-writing of the job description of Medical Officer. Because the court determines that the first of these fails to establish an inference of discrimination based on sex, and that the last two do not amount to adverse employment actions, the plaintiff fails to establish a *prima facie* case of §1983 discrimination under a discrete acts theory.

### 1)  Understaffing

The dominant and repeated claim in the plaintiff's amended complaint is that "disparate and discriminatory treatment" towards her was the direct cause of "persistent unresolved under-staffing of the clinic," which allegedly continued up to her "retreat" to the position of medical officer.[4]  Am. Compl. ¶ 71.  Specifically, beginning in 1989, the plaintiff complains of the same chronic understaffing and resulting additional workloads throughout the remainder of her employment at the STD Clinic.  *Id*. ¶¶ 126, 140.

The plaintiff's allegations and submissions to this court do not support a reasonable inference of discrimination based on sex.  An adverse employment action gives rise to an inference of discrimination if the plaintiff shows that (1) she is a member of a protected class; (2) she was similarly situated to an employee who was not a member of the protected class; and (3) she and the similarly situated employee were treated disparately.  *Holbrook v. Reno*, 196 F.3d

---

[4]The defendant argues that the plaintiff's allegations of intolerable work conditions are properly analyzed as discrete adverse employment acts.  Def.'s Mot. at 15.  Because the plaintiff alleges intolerable working conditions resulting from understaffing throughout her thirty years of employment at the Clinic, the defendant asserts that the "act" of understaffing must have occurred decades before the plaintiff brought this action, and is therefore barred by the statute of limitations.  *Id*.; *see also Delaware State College v. Ricks*, 449 U.S. 250, 257 (holding that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination"); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (holding that past acts of discrimination outside of the limitations period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue," but the emphasis must be placed on "whether any present *violation* exist[s]," and not "on mere continuity") (emphasis in original).

As the Court recognized in *Morgan*, however, "[t]here may be circumstances where it will be difficult to determine when the time period should begin to run.  One issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered."  *Morgan*, 536 U.S. at 115 n.7.  The plaintiff's allegations of understaffing, for example, could arguably involve characterizing the discriminatory act as occurring repeatedly as the District failed or refused to hire sufficient staff at the Clinic for several decades.  This characterization would make the discrimination a "discrete act" of understaffing within the limitations period because the plaintiff alleges it persisted up to her resignation in late August 1999.  Furthermore, as the only STD Clinic Chief in the District beginning in 1996, the plaintiff may not reasonably have been expected to discover the gender based animus allegedly motivating the understaffing of her clinic until Dr. Sankar, a male, took over her job and was treated differently.  For this reason, the plaintiff's understaffing claim is not barred by the statute of limitations.

255, 261 (D.C. Cir. 1999).  Although the plaintiff and Dr. Sankar were "similarly situated," the

major flaw in the plaintiff's understaffing claim is her assumption that the understaffing

problems in the District are unique to her as Clinic Chief.  In most employment contexts,

understaffing affects many more employees than just supervisors.  *Lomboy v. Swedish Covenant*

*Hosp.*, 1996 WL 189301, at *4 (N.D. Ill. April 17, 1996) (stating that "[e]ven assuming that it is

true that the plaintiff was overworked because of a staffing shortage . . . and that [her

department] was 'grossly mismanaged,' these reasons do not show that plaintiff was

discriminated against because of her national origin.  In fact these work environment problems

would affect everyone, not just the plaintiff").

The plaintiff acknowledges the ubiquity of understaffing in government offices in her

letter to Richard A. Levinson, Administrator of the PHSA, on June 15, 1992 regarding problems

and issues at the S.E. Clinic:

> [t]he staff, which has witnessed its ranks shrink while its responsibilities increase,
> is more and more difficult to supervise.  Their morale is low and there is a
> perception on their part that they work harder and are treated with less
> consideration than other district government employees.  This is an accurate
> assessment.  Those who were able to leave have left.  They left as a direct result
> of neglect on the part of the administration.  Others will leave, when possible, for
> the same reason.

Def.'s Original Mot., Ex. A.  As alleged by the plaintiff, staff members of the S.E. Clinic,

comprised of both men and women, were neglected alike by the District as a result of inadequate

staffing.  *See* Am. Compl. ¶¶ 45, 74.

Furthermore, the events surrounding the N.W. Clinic's merger with the S.E. Clinic

further undermine any reasonable inference that understaffing was a result of discrimination

towards the plaintiff.  The district's inability to retain these employees for even a brief period of

time – due to disease trends and higher patient numbers, by the plaintiff's admission – suggests

against an inference that the district refused to sufficiently staff the S.E. Clinic in order to discriminate against the plaintiff because of her gender.[5]   Accordingly, the plaintiff has failed to demonstrate disparate treatment based on understaffing, and her understaffing claim, as a discrete adverse employment action, is dismissed for failure to establish a prima facie case of sex discrimination.

### 2)  Constructive Discharge

An actionable constructive discharge claim requires a showing that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment.  *Carter v. George Washington Univ.*, 180 F. Supp. 2d 97, 110 (D.D.C. 2001) (citing *Clark v. Marsh*, 665 F.2d 1168, 1173-74 (D.C. Cir. 1981)); *See Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (holding that a plaintiff alleging constructive discharge must show that the "employer deliberately made working conditions intolerable and drove the employee out" of the position).  As the Fourth Circuit has stated,

> [e]very job has its frustrations, challenges and disappointments; these inhere in the nature of work.  An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.  He is not, however, guaranteed a working environment free of stress.  The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred.  They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Bristow v, Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).

---

[5] *See* Def.'s Mot. at 38 (stating that "[u]nderstaffing is a constant problem in most local government organizations.  In the District, where funds and resources are stretched to their limit, it is unreasonable to infer [discrimination] from such conditions.  Add to that the fact that the plaintiff's workplace was a public-access STD Clinic located in the Southeast quadrant of the District, and it is even less surprising that there were understaffing problems at the Clinic").

The plaintiff has failed to allege or show facts that could amount to a constructive discharge. The plaintiff alleges that the intolerable working conditions, which were primarily a result of the alleged intentional understaffing of the Clinic, were present at all times during her three-decade-long tenure as an employee of the Clinic. *See, e.g.,* Am. Compl. ¶¶ 29-32, 34, 37-43, 46-48, 51-55, 57-62, 64, 67, 69-71, 85, 87. The plaintiff does not allege any aggravating factor close in proximity to her resignation and justifying her conclusion that she had no option but to retreat to a lesser position, other than her own development of illness. *Id.* ¶ 61. This factor alone, however, cannot establish a constructive discharge. *See, e.g., Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (holding that "an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer"); *Murray-Dahnir v. Loews Corp.*, 2001 WL 357074, *2 (S.D.N.Y. 2001) (holding that "Plaintiff provides no allegations that Defendant changed or increased Plaintiff's work load after finding out Plaintiff had a medical condition putting his health in jeopardy. Therefore, it cannot be inferred that Defendant intentionally placed Plaintiff in a position which would jeopardize his health").

Furthermore, the plaintiff's own allegations point away from her assertion that she was constructively discharged. After the plaintiff informed Dr. Calderone of her illnesses, Dr. Calderone directed the Bureau Chief to "immediately find money to hire at least one additional physician for the [S.E. Clinic], and promised to hire a second physician in October 1999." Am. Compl. ¶ 66. The plaintiff alleges that officials and policy makers of the DOH "intentionally made promises to alleviate the understaffing at the [S.E. Clinic]," and "failed to act on its

promises or deliberately deluded (and lulled) plaintiff into believing that the workplace understaffing would be addressed[.]" Pl.'s Opp'n at 15. The court is unable to draw any reasonable inference that the defendant made these promises in order to force the plaintiff to quit her position as Clinic Chief; rather, the opposite seems more likely – that the promises of impending improvements in staffing were made to keep the plaintiff in her position as Clinic Chief.

Finally, the plaintiff's reliance on understaffing, even assuming *arguendo* "intolerable work conditions" at least a decade before her "retreat," fails to establish a constructive discharge. To establish a constructive discharge, a plaintiff must leave her employment within a "reasonable time" after suffering an act of discrimination. *Smith v. Bath Iron Works*, 943 F.2d 164, 167 (1st Cir. 1991). A decade is certainly not a "reasonable time" to leave a job which has become intolerable. *See, e.g., Landrau-Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000) (holding that a plaintiff who resigned seven months after alleged discriminatory acts could not claim constructive discharge). If workplace conditions had become "intolerable" shortly before the plaintiff's resignation, they became so because of the plaintiff's illnesses, and not because of any further actions by the district. Accordingly, the plaintiff has failed to demonstrate a constructive discharge, and her constructive discharge claim, as a discrete adverse employment action, is dismissed for failure to establish a prima facie case of sex discrimination.

### 3)  Change in Job Description of Medical Officer

The third alleged discrete adverse employment action occurring after July 31, 1999 is the DOH officials' demand that the job description of medical officer be rewritten to add duties before the plaintiff could assume the position. Am. Compl. ¶¶ 89-90. A male colleague of the

plaintiff, Dr. Elliot, had previously held the position of medical officer under the plaintiff's direction as Clinic Chief, but had later left the S.E. Clinic, leaving the position vacant. *Id.* ¶ 122. Dr. Elliot, employed under the "long-standing and existing job description for medical officer," was not required to perform such additional duties.[6]  These additional responsibilities were some of those the plaintiff had performed as Clinic Chief, including a "myriad [of] clinical administrative and supervisory functions[.]"  *Id.* ¶ 90.

A change in the responsibilities and duties of one's job, without other aggravating factors, does not constitute an adverse employment action. *See, e.g., Mungin*, 116 F.3d at 1556-57 (stating that "[p]erhaps in recognition of the judicial micromanagement of business practices that would result if we ruled otherwise . . . changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour change"); *Lester v. Natsios*, 290 F. Supp. 2d 11, 29 (D.D.C. 2003) (holding that "'increased workloads' and undesirable work assignments . . . do not rise to the level of adverse employment actions"); *see also Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) (holding that such a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities").  Also, the plaintiff acknowledges that she suffered no reduction in economic benefits that had been afforded past medical officers as a result of this change in job description.  Am. Compl. ¶ 74.

Moreover, the change in job description was not forced on the plaintiff as a condition of keeping her job; rather, the change in job description occurred after the plaintiff's own decision to leave her position as Clinic Chief to assume the position of medical officer.  The plaintiff acknowledges her awareness of the changed job description prior to assuming the position.  This

---

[6] The plaintiff refers to another predecessor who held the position of medical officer, Dr. Concepcion.  Am. Compl. ¶ 76.  The plaintiff's complaint does not indicate Dr. Concepcion's gender.

prior awareness undermines her claims of an adverse employment action.  *See Bryant v. Brownlee*, 265 F. Supp. 2d 52, 62 (D.D.C. 2003) (holding that a change in work assignments for a plaintiff who was "warned before she began working . . . that the work would be 'unchallenging and very narrowly focused" did not constitute an adverse employment action).[7]

Accordingly, the court concludes that the plaintiff has failed to establish a prima facie case because her change in job description is not an actionable adverse employment action, and her claim of change in job description, as a discrete adverse employment action, is dismissed.

## 2.  The Plaintiff's Hostile Work Environment Claim

### a. Legal Standard

Title VII prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, or national origin.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Toward that end, an employer may not create or condone a hostile or abusive work environment that is

---

[7]According to the plaintiff, the change in job description carried with it no adverse effects, such as new long hours or other disruptive changes in working conditions from the duties she previously performed, other than the change itself.  The plaintiff merely alleges that she was forced to perform duties that are part of Dr. Sankar's duties as Clinic Chief, and that the district "acted intentionally to assign to plaintiff other prolonged and stressful duties that were never part of the duties of plaintiff's male predecessors in the position[] of . . . medical officer [.]"  Am. Compl. ¶ 195.  Although the court makes all reasonable inferences in favor of the plaintiff, these conclusory statements are unsupported by any factual allegations.  *See Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 91 (D.D.C. 2004) (stating that "[w]hile many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations"); *see also Feliciano de la Cruz v. El Conquistador Resort*, 218 F.3d 1, 5 (1st Cir. 2000) (noting that "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue . . . summary judgment [is compelled] if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation") (internal quotations omitted).  Rather, the plaintiff's factually-bare allegations that the re-written job description was a "pretext to force Dr. Turner to perform any and every duty in the clinic at the whim of her supervisors," Am. Compl. ¶ 89, suggest subjective feelings of inconvenience and dissatisfaction with the change in job description rather than a tangible adverse employment action.  *See Forkkio*, 306 F.3d at 1130-31 (holding that "[p]urely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions") (internal citations omitted).

discriminatory. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).  Such an

environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" *Singletary v. District of Columbia*,

351 F.3d 519, 526 (D.C. Cir 2003) (quoting *Meritor*, 477 U.S. at 65, 67).  On the other hand,

"[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work

environment – an environment that a reasonable person would find hostile or abusive – is

beyond Title VII's purview." *Harris*, 510 U.S. at 21.  Thus, to determine whether a hostile work

environment exists, the court looks to the totality of the circumstances, including the frequency

of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an

employee's work performance. *Id.* at 23; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88

(1998).  In considering the totality of the circumstances, however, the court is mindful that

> [e]veryone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals.

*Bryant*, 265 F. Supp. 2d at 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d

Cir. 2002)).

### b. The Plaintiff Fails to Establish a Hostile Work Environment

The plaintiff attempts to avoid the three-year limitation barring some of her claims by

arguing that they are properly understood as evidence of a hostile work environment.  Pl.'s

Opp'n at 11.  As opposed to discrete acts of discrimination, a claim for hostile work environment

is timely as long as "any act that is part of the hostile work environment" is complained of

within the limitations period. *Morgan*, 536 U.S. at 117-118 (noting that the "unlawful

employment practice" constituting a hostile work environment "cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own").  The plaintiff argues that her forced resignation as Clinic Chief was part of a hostile work environment she had been enduring, and that her claim is therefore timely.  Opp'n at 7.

The plaintiff seeks to incorporate more than three decades of "intolerable working conditions" and scattered instances of alleged adverse employment actions into a claim of a hostile work environment.  These conditions and incidents, however, do not involve anything like the pervasive ridicule and insults that constitute a hostile work environment.  *See Brody*, 199 F.3d at 454 (holding that a hostile work environment is one that is "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers") (internal quotations omitted); *see also Trujillo v. Health Sciences Center*, 157 F.3d 1211, 1214  (10th Cir. 1998) (granting summary judgment against a plaintiff's hostile work environment claim which did not allege the plaintiff was "subjected to anything that was physically threatening or humiliating, nor was he subjected to any offensive utterances," and whose "list of grievances include[d] none of the racial comments or ridicule that are hallmarks of hostile work environment claims").  While the plaintiff repeatedly alleges "intolerable" work conditions, the plaintiff has not alleged any pervasive harassing, threatening, or insulting behavior in her work environment, and while the nature of one's stress level and responsibilities may be relevant to an action for a discrete act of discrimination, stress by itself cannot establish a hostile work environment.  As the court in *Trujillo* commented:

> [t]he hostile work environment that Plaintiff portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world.  Normal job stress does not constitute a hostile or abusive work environment.  As the Seventh Circuit explained, federal law "does not guarantee a

utopian workplace, or even a pleasant one . . . Personality conflicts between employees are not the business of the Federal courts." We cannot villify every supervisor that implements a policy with which an employee disagrees or that monitors her employees' conduct.

*Trujillo*, 157 F.3d at 1214 (internal citations omitted).

The only arguable instances of ridicule that the plaintiff complained of are that Dr. Sankar "objected to, and mocked me for my use of available sick leave time[.]" Turner Aff., ¶ 14-15. On one occasion, following the plaintiff's request to speak privately with Dr. Sankar about a shortage of medical gloves, "he loudly and rudely stated that anyone that has a problem with seeing patients in the absence of proper gloves and culture media should go to their office and read the newspaper, or whatever they want to do." *Id.* ¶ 17. These additional allegations, while perhaps offensive or unprofessional, do nothing to cure the deficiency of the plaintiff's hostile work environment claim. *See Harris*, 510 U.S. at 21 (noting that "merely offensive" conduct does not create a hostile environment); *cf. Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 849 (D.C. Cir. 2001) (stating that "[a] mere 'nasty' attitude exhibited by a supervisor is insufficient to establish a hostile atmosphere, especially where, as here, there is no evidence that the 'nasty' attitude is pervasive and constant").

There is also no evidence of a sexist motivation in either event.[8] Indeed, one of the plaintiff's allegations is that in 1995, a new nursing assistant, Mrs. Britt, was transferred to the S.E. Clinic from the N.W. Clinic, but was not directed by supervisors to perform duties at the S.E. Clinic she had previously performed at the N.W. Clinic. Am. Compl. ¶ 49. For example, the plaintiff alleges in her affidavit that on one occasion Mrs. Britt refused to "read slides" the plaintiff had prepared for a patient. Turner Aff. ¶ 16 (stating that "[a]s Mrs. Britt refused to read the slide, she informed me that I would have to read my own slide"). Dr. Sankar allegedly

---

[8] The plaintiff's allegations suggest they had to do with her illness and use of sick days, rather than her gender. *See* Am. Compl. ¶ 192.

"supported" Mrs. Britt's refusal, and "threatened [the plaintiff] with insubordination if [the plaintiff] did not read the slide." *Id*. The plaintiff alleges that this direction was made "with the intent to discriminate against Dr. Turner on the basis of her gender." Am. Compl. ¶ 50. It is nonsensical to draw an inference of gender discrimination, however, from an action allegedly directing one female employee to perform certain tasks instead of another female employee. *See Harvath v. Thompson*, 329 F. Supp. 2d 1, 5 (D.D.C. 2004) (stating that the burden of demonstrating discrimination "is even tougher" where the plaintiff's gender is the same as the alleged source of the discrimination). The holding in *Harvath* rings particularly true where, as here, the plaintiff's and co-worker are allegedly treated differently, yet have the same gender.

Accordingly, the court grants the defendant's motion for summary judgment as to the plaintiff's hostile work environment claim.

### D. Disability Discrimination

In addition to her allegations of sex discrimination, though based on virtually identical events and factual allegations as her § 1983 claims, the plaintiff also alleges she was discriminated against because of her illnesses (hypertension and diabetes), and brings claims under the Rehabilitation Act ("RA") and the Americans with Disabilities Act ("ADA"). These discriminatory events include her involuntary discharge, Am. Compl. ¶ 181, and the defendant's failure to adequately staff the Clinic prior to the plaintiff assuming the position of medical officer, *id*. ¶¶ 187-89, 192, 200-01. In addition, the plaintiff alleges she was retaliated against for "seeking accommodation of her illness and redress of the violation of her constitutional rights," *id*. ¶ 202, through the creation of a hostile work environment by Dr. Sankar, *id*., and Dr. Sankar's denial of her use of sick days, *id*. ¶ 192. For the reasons set forth below, the court

grants summary judgment as to all of these claims, with the exception of the plaintiff's retaliation claim involving denial of sick days.

### a. Statute of Limitations

The Rehabilitation Act directs courts to apply the ADA's standards to RA claims. 42 U.S.C. § 12117(b). The ADA incorporates the statute of limitations provided for actions brought under Title VII. 42 U.S.C. § 12117(a) (stating that the ADA incorporates "the powers, remedies, and procedures set forth in [Title VII]," including 42 U.S.C. § 2000e-5); *Conner v. Reckitt & Colman*, 84 F.3d 1100, 1102 (8th Cir. 1996). Under Title VII, a complainant who has previously instituted proceedings with a state or local agency must file an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged adverse employment action. 42 U.S.C. § 2000e-5(e); *Lorance v. AT&T Technologies*, 490 U.S. 900, 904 n.2 (1989). The plaintiff filed an administrative complaint with the OHR on August 19, 2000, Def.'s Mot., Ex. B, which was cross-filed with the EEOC on December 18, 2000, Def.'s Original Mot., Ex. B ¶ 4 (Stewart Aff.). All discriminatory events that occurred before February 22, 2000 – 300 days before the date the charge was cross-filed with the EEOC[9] – are therefore barred as untimely. Accordingly, the defendant's failure to adequately staff the Clinic while the plaintiff served as Clinic Chief, *id*. ¶ 187-89, and its rewriting of the job description of the position of medical officer, *id*. ¶ 201, both allegedly in discrimination of her illnesses, are time-barred.

---

[9] The defendant erroneously asserts in her original opposition that 42 U.S.C. § 2000e-5(e) requires her to file her *state or local agency charge* within 300 days after the alleged unlawful employment practice occurred. Pl.'s Original Opp'n at 35. The 300 day period only becomes applicable when such a local administrative process has already begun, and merely allows a longer period for an EEOC charge to be filed in such circumstances. 42 U.S.C. § 2000e-5(e)(1). When a local or state proceeding has not been instituted, the EEOC charge must be filed within 180 days after the alleged unlawful employment act occurred. *Id*.

The plaintiff argues that the court should use equitable estoppel to preclude the effect of the statute of limitations because William Byrd, Program Chief of the Department of Human Services Employee Consultation and Counseling Service, told her "that she should rethink the decision to file a grievance because filing the grievance could create a problem, and was not likely to be well taken by the administration." Pl.'s Opp'n at 18. The plaintiff does not allege, however, that this event had any effect on when she filed her OHA complaint, and alleges no misleading statements by Mr. Byrd or "active steps to prevent the plaintiff from litigating in time." *Currier v. Radio Free Europe/Radio Liberty Inc.*, 159 F.3d 1363, 1367 (D.C. Cir. 1998). Accordingly, the court will not apply equitable estoppel to save the plaintiff's barred claims.

### b. Retaliation

The only timely-filed claims under the ADA and RA are instances of ridicule and disrespect of the plaintiff by Dr. Sankar,[10] and his denial of leave to take sick days, actions taken in retaliation for Dr. Turner's administrative complaint to the OHR. Stewart Aff. ¶¶ 192, 205. The plaintiff amended her complaint to include this retaliation claim on April 12, 2002. *Id.* ¶ 5; Pl.'s Opp'n, Ex. B.

---

[10] The plaintiff seems to make a claim for both retaliation (via an adverse employment action) and retaliation by creation of a hostile work environment. For the reasons previously set forth, the plaintiff has failed to establish a hostile work environment. Specifically, while the plaintiff alleges that her use of available sick leave time was "objected to, and mocked" by John Heath and Dr. Sankar, Turner Aff. ¶¶ 14-15, the plaintiff does not provide any concrete factual allegation from which the court could infer a hostile work environment. *See Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97, 111 (D.D.C. 2001) (noting that "self-serving affidavits alone will not protect the non-moving party from summary judgment"); *see also Von Gunten v. Maryland*, 243 F.3d 858, 869-70 (4th Cir. 2001) (holding that "hyper-scrutiny" of sick leave requests, even where other employees were not required to provide written documentation for their absences, did not amount to an adverse action or a retaliatory hostile work environment).

### 1.  Legal Standard for Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) the employer took an adverse personnel action, and (3) there existed a causal connection between the two.  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999).  The plaintiff's burden is not great: the plaintiff "merely needs to establish facts adequate to permit an inference of retaliatory motive."  *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

With regard to the first prong of the plaintiff's *prima facie* case of retaliation, statutorily protected activities include the filing of EEO complaints.  *Forkkio v. Powell*, 306 F.3d 1127, 1131-32 (D.C. Cir. 2002).  As for the second prong, "to establish an adverse personnel action in the absence of diminution of pay or benefits, plaintiff must show an action with materially adverse consequences affecting the terms, conditions, or privileges of employment."  *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (quoting *Brown*, 199 F.3d at 457).  Minor changes in work-related duties or opportunities do not qualify as actionable injuries unless accompanied by adverse changes in the terms, conditions, or privileges of employment.  *Id*. at 1135.  Likewise, "[m]ere inconveniences and alteration of job responsibilities will not rise to the level of adverse action."  *Id*. (internal citations omitted).

Finally, under the third prong, the plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)).  To qualify as a causal connection, however, the temporal proximity between the employer's knowledge of the protected activity and the adverse personnel action must be "very close."

*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that a three or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and that a 20-month period suggests "no causality at all").  The plaintiff need not exhaust her administrative remedies to file a claim of retaliation.[11]   *Baker v. Library of Congress*, 260 F. Supp. 2d 59, 66 n.4 (D.D.C. 2003) (citing *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1993); *Brown v. Hartshorne Public School District # 1*, 864 F.2d 680, 682 (10th Cir. 1988); and *Hayes v. Shalala*, 902 F. Supp. 259, 266 (D.D.C. 1995)).

### 2. The Court Denies the Defendant's Motion for Summary Judgement as to Plaintiff's Retaliation Claim

In her amended complaint to the OHR, the plaintiff alleges that, on March 26, 2002, Dr. Sankar told the plaintiff that "he had been called and questioned by someone at the Department of Human Rights about the investigation" and accused the plaintiff of "trying to take charge and run the clinic [.]"  Opp'n Ex. B.  After this date, the plaintiff alleges that her "use of sick leave [was] criticized as being excessive and consequently, [she was] pressured to come to work when not feeling well, and coerced to limit certain medical and dental appointments in order to avoid the intimidation."  *Id*.  In some instances, Dr. Sankar denied her use of sick days "for which she was qualified[.]"  Am. Compl. ¶ 192.  These factual allegations raise a genuine issue of material fact as to whether the plaintiff suffered an adverse employment action in retaliation for filing an OHR complaint.  *See Washington v. White*, 231 F. Supp. 2d 71, 81 (D.D.C. 2002) (stating that

---

[11] The plaintiff's opposition includes a memorandum to the OHR dated April 12, 2002, which contains her allegation of retaliation.  Although this memorandum is unsigned and unverified, the OHR acknowledges its receipt, and its inclusion of a retaliation claim.  Def.'s Original Mot., Ex. B ¶ 3 (Stewart Aff.).  The defendant argues that the plaintiff has failed to exhaust her administrative remedies as to this claim because the memorandum does not allege that the plaintiff was actually denied sick leave, Reply at 32, and that this claim is therefore not "reasonably related" in scope to the allegations the plaintiff does make, Def.'s Mot. at 55.  The proposition that exhaustion is unnecessary for retaliation claims stems in part, however, from the fear that filing a separate charge will result in more retaliation, and that a retaliation claim is necessarily related to the underlying charge.  *Nealon*, 958 F.2d at 590.  Accordingly, the plaintiff need not exhaust her administrative remedies before bringing suit for retaliation.

"[a] leave restriction presumably limits the circumstances under which an employee may take leave that has been earned, and might be considered an adverse personnel action insofar as it restricts plaintiff's ability to take leave to which he would otherwise be entitled").  Accordingly, the court denies the defendant's motion for summary judgment as to the plaintiff's retaliation claim.

### E.  The Court Grants the Defendant's Motion for Summary Judgment as to Plaintiff's Equal Pay Act Claim

The Equal Pay Act prohibits employers from discriminating

> between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor than sex [.]

29 U.S.C. § 206(d)(1).  To establish a violation of the Equal Pay Act, a plaintiff must demonstrate that "the employer paid male and female employees different wage rates for substantially equal work."  *E.g., Broadus v. O.K. Industries, Inc.*, 226 F.3d 937, 941 (8th Cir. 2000).

The plaintiff concedes that she and her predecessor, a male, received the same salary.[12] Am. Compl. ¶ 76.  The plaintiff instead brings her claim under the Equal Pay Act on the grounds that she performed more work for the same pay as her male predecessor.  The mere fact that both Dr. Elliot and the plaintiff were employed under the job title "medical officer," and had different duties while receiving equal pay, however, cannot support a *prima facie* case under the Equal

---

[12] The Equal Pay Act bars any action not filed within two years after a cause of action accrues, and allows three years if the offending conduct was willful.  29 U.S.C. § 255.  Even accepting the plaintiff's claims of willful discrimination as true, any claim concerning her position as Bureau Chief, which she held simultaneously with the position of Clinic Chief, is time-barred.

Pay Act. This is simply not a situation the Equal Pay Act was designed to address. *See Gunther v. County of Wash.*, 623 F.2d 1303, 1311 (9th Cir. 1979) (holding that the Equal Pay Act "applies only to situations where a plaintiff contends there has been a denial of equal pay for equal work. It does not apply, for instance, where the plaintiff is performing comparable (but not substantially equal) work, or where a position held by the plaintiff is unique"); *Orahood v. Bd. of Trs. of the Univ. of Ark.*, 645 F.2d 651, 654 n.3 (8th Cir. 1981) (noting that "[w]here the claim is one involving inadequate compensation, but a comparison with equal work is not possible, Title VII may still provide relief" where the Equal Pay Act cannot). Accordingly, the court grants the defendant's motion for summary judgment as to plaintiff's Equal Pay Act claim.

### F. The Court Grants the Defendant's Motion for Summary Judgement as to Plaintiff's Intentional Infliction of Emotional Distress Claim

To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Futrell v. Dept. of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 307 (D.C. 2000)). In the employment context, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.*; *Duncan v. Children Nat'l Med. Ctr.*, 702 A.2d 207, 211-12 (D.C. 1997) (noting that "generally, employer-employee conflicts do not rise to the level of outrageous conduct").

For many of the same reasons discussed in support of granting summary judgment as to the plaintiff's hostile work environment claim, the plaintiff has failed to allege any set of facts from which a reasonable trier of fact could find in her favor as to her intentional infliction of emotional distress claim. The scattered alleged instances of ridicule the plaintiff claims, while perhaps offensive and unjust, do not rise to the level of "extreme and outrageous" conduct. *See,*

*e.g., Cowley v. North Am. Telecomms. Assn.*, 691 A.2d 1169, 1172 (D.C. 1997) (holding that "[e]ssentially, [the plaintiff] alleges only that he was subjected to contempt, scorn and other indignities in the workplace by his supervisor and an unwarranted evaluation and discharge. While offensive and unfair, such conduct is not in itself of the type actionable on this tort theory").  Accordingly, the court grants the defendant's motion for summary judgment as to the plaintiff's intentional infliction of emotional distress claim.

## IV. Conclusion

For the foregoing reasons, the court grants the defendant's motion for summary judgment as to the plaintiff's § 1983, Equal Pay Act, and Intentional Infliction of Emotional Distress claims, and denies summary judgment as to the plaintiff's retaliation claim.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 25th day of August, 2005.

RICARDO M. URBINA
United States District Judge